IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
SOUTHERN DIVISION

FILED
2009 OCT 22 A 11: 31
U.S. DISTRICT COURT
EASTERN DIST. TENN.
BY_____ DEPT. CLERK

LIBERTY MUTUAL FIRE INSURANCE COMPANY,

    Plaintiff,

v.

    No. 1:09-cv-271
    Collier/Lee

A STAFFING KOMPANY, INC.,
APPS, INC., JERRY SCHEIB,
LORETTA SCHEIB, and
DORIS BURNS,

    Defendants.

## COMPLAINT

COMES NOW the plaintiff, Liberty Mutual Fire Insurance Company, by and through its undersigned counsel, files this Complaint and, for cause of action, states as follows:

### PARTIES AND JURISDICTION

1.     Plaintiff Liberty Mutual Fire Insurance Company (hereinafter "Liberty Mutual"), is a Wisconsin corporation with its principal place of business in Boston, Massachusetts.

2.     Defendant A Staffing Kompany (hereinafter ""SK"), during the subject period, was a Tennessee corporation with its principal place of business in Bradley County, Tennessee, and is within the jurisdiction of this court.

3.     Defendant APPS, Inc. ("APPS"), during the subject period, was a Tennessee corporation with its principal place of business in Bradley County, Tennessee, and is within the jurisdiction of this Court.

4. Defendant Jerry Scheib (hereinafter "Mr. Scheib"), is a resident of Knox, County, Tennessee, and is within the jurisdiction of this court.

5. Defendant Loretta Scheib (hereinafter "Mrs. Scheib"), is a resident of Bradley County, Tennessee, and is within the jurisdiction of this Court.

6. Defendant, Doris Burns (hereinafter "Burns"), is a resident of Bradley County, Tennessee, and is within the jurisdiction of this Court.

7. This Court has jurisdiction pursuant to 28 U.S.C. §1332 in that the amount in controversy exceeds $75,000.00 exclusive of interest and costs and because there is complete diversity of citizenship between the plaintiff and defendants.

8. Venue is proper in this Court.

9. This case involves claims for unpaid workers' compensation insurance premiums under Tennessee common law causes of actions for breach of contract, breach of the covenant of good faith and fair dealing, fraud, negligent misrepresentation, and unjust enrichment.

10. This case, originally filed in this Court in 2004 under case number 1:04-cv-209, was settled in 2007 pursuant to a Settlement Agreement and Mutual Release ("the Agreement"), which also settled a then pending administrative contested matter filed with the Tennessee Department of Commerce and Insurance, docket number 17.28-076562A, styled *Optimum Staffing, Inc. v. Liberty Mutual Insurance Company*.

11. Pursuant to the Agreement, a third party, Optimum Staffing, agreed to pay Liberty Mutual $2 million to settle both the 2004 Litigation and the administrative matter, which sum was to be paid over 4 years.

2

12. Optimum Staffing made all required payments pursuant to the Agreement after execution in 2007 until earlier this year in 2009, at which time Optimum stopped making payments.

13. On August 10, 2009, Optimum Staffing filed for bankruptcy protection in the United States Bankruptcy Court for the Eastern District of Tennessee, case number 09-15008.

14. Each of the individual defendants in this case signed the Agreement and guaranteed the payment of the full settlement amount of $2 million as agreed to by the parties.

15. Pursuant to the Agreement, upon a default of the payment of the settlement sum by Optimum Staffing, Liberty Mutual, per its sole discretion, may choose to enforce the Agreement or rescind the Agreement.

16. Liberty Mutual chooses to rescind the Agreement.

17. The Agreement further provides that should Liberty Mutual rescind the Agreement, it may retain all dollars paid under the Agreement and apply those payments against any final judgment or settlement.

18. The parties further agreed in the Agreement that no statute of limitation or any other defenses shall have inured to the benefit of any of the parties due to the passage of time since the execution of the Agreement. Thus, this Complaint is timely.

19. The following are the same factual allegations and causes of action as stated in its filed pleadings from the earlier filed case in 2004, with the only modification being the revision to the amount of premium owed.

## **BACKGROUND ALLEGATIONS**

20. In Tennessee, all employers with five or more employees are required to maintain workers' compensation insurance. Some companies are not able to obtain workers' compensation

insurance in the voluntary market because of the company's poor claims history, the hazardous nature of its business activities, its small size or high premium costs. When an employer in Tennessee is unable to obtain workers' compensation coverage through the voluntary market, the employer may apply for coverage under the Tennessee Workers' Compensation Insurance Plan (hereinafter "Tennessee Plan").

21. During the operative period for this case, AON was the state-appointed administrator of the Tennessee Plan.

22. In order to apply for coverage under the Tennessee Plan, the employer must submit to AON a written application and an estimated premium deposit computed from, in part, premium formulas generated by AON and approved by the Tennessee Department of Commerce and Insurance.

23. Upon receipt of the application and premium deposit, AON issues a written insurance binder to the employer and randomly designates an insurance carrier which issues a policy of workers' compensation insurance in its own name.

24. Since an insured's actual premium must match the risk being insured, the estimated premium stated on the application provided to AON is subject to audit and revision by the carrier to whom the employer has been assigned.

25. An employer's actual workers' compensation insurance premium is determined, to a large degree, by the product of the following three (3) factors:

    (a) size of payroll;

    (b) the rate corresponding to the classification code(s) for the type of work the insured's employees perform; and

4

(c) the "experience modification factor" (hereinafter "MOD"), which is determined by the particular employer's risk history or, in other words, the employer's safety record.

26. Since the MOD is one of the three factors used to determine the actual premiums owed by an insured, the previous safety record of an insured is essential in determining the exposure which the insurance company undertakes and for which it should be compensated, based on the likelihood that an insured with a poor safety record (relative to other employers engaged in the same business) will continue to have higher than average claims.

27. A MOD is a multiplier calculated by the National Council on Compensation Insurance ("NCCI"), a statistical rating corporation located in Florida, based on data regarding previous claims, premium and payroll submitted to NCCI by the employer's previous insurers. For example, a MOD of 1.0 represents the industry average for similar employers; therefore, a MOD of 3.0 would indicate that an employer's loss history is three times the industry average and that, therefore, this employer's estimated premium would be multiplied by three.

28. Pursuant to the Tennessee Plan, a newly chartered corporate entity, one with no previous employment or loss experience, loss history or safety record is assigned a beginning MOD of 1.0 since such employer has no loss history to measure and, therefore, is allowed to begin at the industry-average level. NCCI assigns the MOD for each employer applicant consistent with the Experience Rating Plan Manual, as broadly mandated by the legislature and as specifically approved by the Tennessee Department of Commerce and Insurance. The assignment of the MOD by NCCI presupposes that there has been a full and frank disclosure of the identity, ownership, loss history, and/or conduct of the employer applicant.

29. The Experience Rating Plan Manual specifically prohibits any action taken in any form to evade the determination and application of a correct MOD.

## FACTUAL ALLEGATIONS

A. **Facts Relavant to the Defendants' Avoidance of ASK's Actual Experience Modification Factor.**

30. Prior to April 2000, Mr. Scheib controlled and was the president of APPS, Inc. ("APPS"), a company then engaged in the business of providing temporary workers to its clients.

31. Mrs. Scheib was the 100 percent owner of APPS.

32. Prior to requesting cancellation of coverage, APPS operated out of two locations:

    a.     1300 25th Street Plaza, Cleveland, Tennessee; and
    b.     506 Maple Street, Athens, Tennessee.

33. As APPS had been in business for several years and had a poor loss history, by January 2000 it had developed a MOD of 1.83, which would be effective on its new policy set to renew on 03/23/00.

34. APPS initially sought renewal of its insurance through the Tennessee Plan and submitted an application to AON for a policy beginning 03/23/00 and disclosed a premium due of $185,300.

35. Rather than pay this premium or install new safety measures to lower its premium in the future, Mr. Scheib requested cancellation of this policy on April 4, 2000, claiming APPS was going out of business.

36. Recognizing that APPS's workers' compensation insurance premium would become, at a minimum, eighty-three percent greater than the industry average (due to the APPS MOD of 1.83), Mr. and Mrs. Scheib, with the assistance and/or acquiescence of Burns, took steps to incorporate ASK as a "new" company to obtain a beginning neutral MOD or 1.0 and,

thus, avoid such the eighty-three percent increase to its workers' compensation insurance premium.

37. ASK was formed in April 2000 and, at all times pertinent to this lawsuit, was engaged in the identical business as APPS, namely the business of providing temporary staffing to its clients.

38. On its application to AON for workers' compensation insurance under the Tennessee Plan, ASK reported its business address as 440 Centenary, Cleveland, Tennessee, and its president and 100 percent owner as Burns.

39. According to the federal income tax returns filed on behalf of ASK, secured by Liberty Mutual from third persons during this litigation, Mrs. Scheib was, in fact, the 100 percent owner of ASK.

40. Six months after the application was submitted to AON, ASK requested an endorsement to add three office locations to the policy issued to ASK with the endorsement effective date to be the same as the policy effective date, namely April 14, 2000.

41. Two of the three added locations were the same addresses as APPS. The Centenary address listed on the original application was the personal residence of Burns. ASK never operated out of the Centenary address.

42. The application submitted to AON on behalf of ASK did not disclose an accurate estimate of its payroll, but instead misrepresented the estimated annual payroll of ASK by disclosing only a portion of the payroll ($1 million) and only a small portion of the class codes (four codes). In fact, in a test audit conducted just six months after the application, ASK's payroll was estimated to be almost $1.7 million, with the workers engaged in work encompassing over sixty class codes.

43. The application submitted to AON on behalf of ASK disclosed a premium due of only $29,189.

44. The application submitted to AON on behalf of ASK misrepresented and fraudulently portrayed ASK as a new business with no previous history and did not disclose its relationship and common management and/or ownership, in fact, with APPS.

45. Burns, although the nominal president and 100 percent owner of ASK, as reported on the insurance application, was, in fact, not the 100 percent owner of ASK and was never active in ASK. Indeed, for at least a portion of the policies in question, she was not listed on the ASK payroll.

46. Mr. Scheib continued to control and manage ASK as he had done with APPS regardless of who may have been afforded the nominal title of President. Indeed, Mr. Scheib eventually became president of ASK.

47. Mrs. Scheib continued as the 100 percent owner of ASK, as she had been for APPS. Burns, in fact, never owned or was involved in the business of ASK.

48. After AON processed the application, it bound coverage and assigned the risk of ASK to Liberty Mutual. Liberty Mutual thereafter issued a workers' compensation insurance policy to ASK, policy number WC1-35S-319515-010, for the period 04-14-00, to 04-14-01. This policy was renewed by policy number WC1-35S-319515-011 for the period 04-14-01, to 04-14-02. This policy was renewed by policy number WC1-319515-012 for the policy period 04-14-02, to 04-14-03. This policy was canceled effective November 21, 2002, for nonpayment of premium.

49. The unpaid premium which resulted in the cancellation, as determined at the time, was in the amount of $45,550 for the 04-14-01 to 04-14-02 policy, and $68,081 for the 04-14-02

to 11-21-02 policy. These additional premiums do not relate to the defendants' MOD avoidance scheme. These premiums were simply the result of calculations using the MOD promulgated at that time, together with the reported payroll and class codes.

50. Pursuant to its application submitted in April 2000, ASK portrayed itself to AON as a new company.

51. Because ASK portrayed itself as a new company, the MOD assigned to ASK in April 2000 was a neutral MOD of 1.0 rather than the actual and true MOD of 1.83 which APPS had developed based upon its risk history up to April 2000.

52. By misrepresenting the relationship and common management and ownership that in fact existed between APPS and ASK, ASK and the individual defendants took steps to avoid the proper application of the correct MOD, thereby reducing its workers' compensation premiums owed to Liberty Mutual during the three policy periods.

53. After the incorporation of ASK, it operated out of the same locations as had APPS.

54. After the incorporation of ASK, it continued to be controlled in fact by Mr. Scheib, as had APPS.

55. After the incorporation of ASK, it continued to be owned by Mrs. Scheib, as had APPS.

56. After the incorporation of ASK, it continued with substantially the same client base as that of APPS.

57. After the incorporation of ASK, it continued to have the same general manager and operation manager, which was Mr. Scheib.

58. After the incorporation of ASK, it represented itself as a d/b/a for APPS in UCC filings with the state of Tennessee.

59. After the incorporation of ASK, it continued to have the same phone numbers and fax numbers as had APPS.

60. After the incorporation of ASK, Mr. Scheib reported to its accounts receivable financier, that the move from APPS to ASK was a name change only.

61. ASK is the alter ego and/or successor corporation of APPS.

62. Since the risk history of APPS should have been combined with the risk history of ASK, additional premium is owed based upon the true MOD for ASK.

**B. Facts Relevant to the Defendants' Failure to Disclose the Entire Payroll and Classification Codes for APPS and ASK and Failure to Cooperate in Audit.**

63. APPS stated it went out of business in April 2000. It did not. It continued to stay in business in its own name or through its successor and alter ego, ASK, through June 30, 2000, billed its clients accordingly, incurred expenses, generated revenue, provided employees to its clients, and paid its workers and officers.

64. The officers, managers, and directors of APPS, although having requested that its workers' compensation insurance be canceled, had, in fact, secured coverage for its alter ego and successor entity, ASK, effective April 2000, so that there was no lapse in coverage.

65. The payroll of ASK or APPS from April 2000 to June 30, 2000, was not disclosed in the final audit of APPS nor in the audit of ASK. No premium for this payroll has been paid at any time to Liberty Mutual.

66. Documents secured from third parties during this litigation disclose payroll and classification codes, and the modification factor of 1.83 developed by and assigned to APPS, all

10
Case 1:09-cv-00271-CLC-SKL Document 1 Filed 10/22/09 Page 10 of 17 PageID #: 10

together produce additional premium owed for the 04-14-00 — 04-14-01 policy, policy number WC1-35S-319515-010, of $133,914.00.

67. Based upon calculations made during this litigation using the modification factor developed by APPS, the total premium owed by ASK for the 04-14-01 — 04-14-02 policy, policy number WC1-35S-319515-011, of $246,971.00.

68. After ASK was disclosed as going out of business in November 2002, ASK did not cooperate with the auditors of Liberty Mutual in order that it be allowed to conduct a final audit for this policy period.

69. Based upon documents secured during this litigation from third parties and from ASK, the true amount of payroll, classification codes and modification factor for this policy period have been determined and result in the total premium still due and owing for the 04-14-02 — 04-14-03 policy, policy number WC135S319515012, of $460,388.

70. The total premiums for all three policy periods have been invoiced during this litigation, but the defendants have not paid any portion of these sums.

## CAUSES OF ACTION

### COUNT I

### BREACH OF CONTRACT AS TO ASK AND APPS

71. Paragraphs 1 through 70 of the Complaint are realleged and incorporated herein by reference.

72. On or about April 13, 2000, ASK made a written offer, through its written application to AON, to purchase workers' compensation insurance.

73. AON assigned coverage to Liberty Mutual, thereby accepting ASK's offer, and Liberty Mutual issued three separate, consecutive policies:

11

    a.      Policy number WC1-35S-319515-010 for policy period 04-14-00 to 04-14-01;

    b.      Policy number WC1-35S-319515-011 for policy period 04-14-01 to 04-14-02; and

    c.      Policy number WC1-35S-319515-012 for policy period 04-14-02 to 04-14-03.

74. Under the terms of the policy contracts, ASK agreed to pay all premiums as determined by Liberty Mutual through audit and pursuant to appropriate manual of Rules, Regulations, Rating Plans and Classifications.

75. Under the terms of the policy contents, ASK agreed to cooperate with its insurer in audits and not to take any steps to avoid the proper application of a MOD.

76. Liberty Mutual fully performed its obligations under each policy it issued to ASK.

77. Despite Liberty Mutual's performance, ASK, in violation of its obligation and promises under the policies failed to disclose all payroll and classification codes for the first and third policies, failed to cooperate in the audit of the third policy, and, in order to avoid the proper MOD applicable to the three policies issued by Liberty Mutual, wrongfully failed to disclose its connection and relationship by common management and ownership, in fact, to APPS. By such failures, ASK breached each policy.

78. Despite Liberty Mutual's performance, ASK, in violation of its obligations and promises under the policies, refuses to pay the full amount of premiums owed for the policies in the following amounts:

| | | |
|---|---|---|
| a | Policy WC1-35S-319515-010 | $133,914.00 |
| b. | Policy WC1-35S-319515-011 | $246,971.00 |
| c. | Policy WC1-35S-319515-012 | <u>$460,388.00</u> |
| | Total: | $841,273.00 |

79.    As a proximate result of ASK's breaches of the three policy contracts, there remains due and owing to Liberty Mutual, at a minimum, the sum of $841,273.00 plus pre-judgment interest. ASK has failed to pay this sum although proper demand for payment has been made.

## COUNT II

### BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING AS TO ASK AND APPS

80.    Paragraphs 1 through 79 of the Complaint are realleged and incorporated herein by reference.

81.    By failing to disclose the full payroll and classification codes for all the policies issued to ASK and by failing to disclose its connection to APPS in order to avoid the application of the proper MOD for each policy issued by Liberty Mutual and avoid the resulting premium, ASK breached the implied covenant of good faith and fair dealing which is contained in all Tennessee contracts.

82.    As a proximate result of ASK's breach of the covenant and good faith and fair dealing, there remains due and owing to Liberty Mutual additional premium for all three policies, plus pre-judgment interest, in the total amount of $841,273.

## COUNT III

### FRAUD AS TO ALL DEFENDANTS

83.    Paragraphs 1 through 82 of the Complaint are realleged and incorporated herein by reference.

84.    ASK, by and through its nominal president, Burns, with the knowledge and assistance of Mr. Scheib, stated on the application submitted to AON that it was a new business.

85. The statements described in ¶ 74 were false.

86. The statements described in ¶ 74 were intentional.

87. ASK, by and through its nominal president, Burns, with knowledge and assistance of Mr. Scheib, intentionally misrepresented on the application submitted to AON that its annual payroll would only be $1,000,000, would be comprised only of four types of employees, and that the premium owed would be approximately $29,189.

88. The statement described in ¶ 77 was false.

89. The statement described in ¶ 77 was intentional.

90. ASK, by and through its nominal president, Burns, with the knowledge and assistance of Mr. Scheib, failed to disclose on the application submitted to NCCI its real office locations so as to avoid disclosing its connection to APPS.

91. The failure to disclose described in ¶ 80 was intentional.

92. ASK, by and through its nominal president, Burns, with the knowledge and assistance of Mr. and Mrs. Scheib, failed to disclose that the true 100 percent owner of ASK, as reported to the IRS, was Mrs. Scheib, just as she was for APPS.

93. The actions described in ¶ 82 were intentional.

94. In the audits conducted by Liberty Mutual during the policy periods, ASK, by and through its nominal president, Burns, and with the knowledge and assistance of Mr. Scheib, continued to fail to disclose ASK's connection to APPS.

95. The actions described in ¶ 84 were intentional.

96. Liberty Mutual relied upon the above representations made by ASK, by and through its nominal president, Burns, and with the knowledge and assistance of Mr. Scheib and Mrs. Scheib.

97. Liberty Mutual's reliance referenced in ¶ 86 was reasonable.

98. Based upon the fraudulent application, misrepresentations in audits, lack of cooperation in audit, intentional confusion and failure to disclose its connection through common management or ownership, in fact, to APPS, ASK, by and through its nominal president, Burns, and with the knowledge and assistance of Mr. and Mrs. Scheib, intentionally defrauded Liberty Mutual in order for ASK to avoid paying the actual premium owed for the three policy periods.

99. As a proximate result of the Defendants' fraudulent acts and statements, Liberty Mutual has been damaged.

## COUNT IV

### NEGLIGENT MISREPRESENTATION AS TO ALL DEFENDANTS

100. Pleading in the alternative, paragraphs 1 through 99 of the Amended Complaint are realleged and incorporated herein by reference.

101. The statements described in ¶¶ 74, 77, and 80 were misrepresentations and the actions taken in ¶¶ 82 and 84 were intended to deceive or mislead.

102. ASK, by and through its nominal president, Burns, and with the knowledge and assistance of Mr. and Mrs. Scheib, were negligent in making the statements described in ¶¶ 74, 76 and 79 and taking the misleading actions described in ¶¶ 82 and 84.

103. ASK, by and through its nominal president, Burns, and with the knowledge and assistance of Mr. and Mrs. Scheib, were negligent in their failure to disclose and other actions described above.

104. Liberty Mutual relied upon the representations made by ASK, Burns, Mr. Scheib, and Mrs. Scheib.

105. Liberty Mutual's reliance described in ¶ 93 was reasonable.

106. As a proximate result of the defendants' negligent acts and statements, Liberty Mutual has been damaged.

107. It was foreseeable that Liberty Mutual would rely upon the representations made in the application and in the subsequent audits and other contacts and communications between it and the Defendants to determine the premiums owed for the policies at issue.

## COUNT V

### UNJUST ENRICHMENT AS TO ALL DEFENDANTS

108. Paragraphs 1 through 107 of the Complaint are realleged and incorporated herein by reference.

109. By avoiding the true risk, payroll, classification codes, actual MOD and the resultant premium owed for the three policy periods, through the creation of ASK, the successor and/or alter ego of APPS, ASK and its owners and officers has been unjustly enriched by receiving workers' compensating insurance coverage for the three periods at a rate less than the rate which would have accurately compensated Liberty Mutual for the risk it insured.

## COUNT VI

### CIVIL CONSPIRACY AS TO ALL DEFENDANTS

110. Paragraphs 1 through 109 of the Complaint are realleged and incorporated herein by reference.

111. Burns, Mr. Scheib and Mrs. Scheib, each had the common design to defraud Liberty Mutual by underpaying the workers' compensation insurance due Liberty Mutual for the policies at issue.

112. By engaging in overt acts described in paragraphs 82, 85, 88, 90 and 92, Mr. Scheib, Mrs. Scheib and Burns were each acting in concert and to the detriment of Liberty Mutual.

## PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, Liberty Mutual prays:

    a. For process to issue to the new defendants and an answer be required from all defendants;

    b. For compensatory damages against the defendants in the amount of Eight Hundred Forty-One Thousand Two Hundred Seventy Three Dollars ($841,273);

    c. For punitive damages;

    d. For attorney fees; and

    e. For such other and further relief as justice demands.

Respectfully submitted,

BURCH, PORTER & JOHNSON, PLLC

_____
Scott J. Crosby (#014287)
130 North Court Avenue
Memphis, Tennessee 38103
Attorney for Plaintiff
T: 901.524.5000
F: 901.524.5024
scrosby@bpjlaw.com